(91 App. Div. 557.)

PEOPLE ex rel. GRAHAM v. PARTRIDGE, Police Com'r.

(Supreme Court, Appellate Division, Second Department. March 11, 1904.)

1. CERTIORARI—DISMISSAL OF POLICE OFFICER.

On certiorari to review a determination of the police commissioner dismissing relator from the police department, evidence *held* to sustain such decision.

Hooker and Woodworth, JJ., dissenting.

Certiorari by the people, on the relation of Frank M. Graham, to review the determination of John N. Partridge, as police commissioner of the city of New York, in dismissing the relator from the police department of such city. Affirmed.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, WOODWARD, and HOOKER, JJ.

James W. Ridgway (Thomas Kelby, on the brief), for relator.

James D. Bell (John J. Delany, on the brief), for respondent.

WILLARD BARTLETT, J. I do not question the correctness of the proposition that in a certiorari proceeding to review the dismissal

of a policeman it is the duty of the Appellate Division, to reverse when the finding of guilt is against the weight of evidence. It does not seem to me, however, that the finding in the present case is either opposed to the weight of evidence or without sufficient evidence to support it. The sole question was one of alibi. The identification of the relator as the person who drew the revolver and directed the weapon first toward the two women who accompanied him, and subsequently toward the police officer who made the complaint, was clear and satisfactory if the witnesses who testified in support of the charge told the truth. The witnesses for the defense who testified to the presence of the relator near his home, at a place several miles distant, may well have been honestly mistaken in regard to the precise time when they saw him; and any considerable error in this respect would wholly vitiate the value of their testimony. In a case of this kind the personal impression made by the appearance and demeanor of the several witnesses and their manner of testifying is of the utmost importance in arriving at a just determination; and, after reading through the record several times, I find myself unable to reach the conclusion that it is even probable that the deputy police commissioner erred in his decision that the relator was really the man who participated in the affray which has resulted in his dismissal. I therefore feel constrained to vote for an affirmance.

Determination confirmed.

HIRSCHBERG, P. J., and JENKS, J., concur.

HOOKER, J. (dissenting). The relator, Frank M. Graham, asks this court to review the determination of the police commissioner of the city of New York, which resulted in his dismissal from the police force after a trial before the deputy commissioner. This court has power to review the evidence produced before the police commissioner, and reverse his determination if it be clearly against the weight of evidence. This proposition was decided in People ex rel. McAleer v. French, 119 N. Y. 502, 508, 23 N. E. 1061, 1063. In that case Judge Earl, speaking for the court, said:

"In all this class of cases it is the duty of the Supreme Court not only to inquire whether there is any competent proof tending to establish the guilt of the accused officer, but it must look into the evidence, and, if it finds that there is a preponderance of evidence against the determination of the commissioners, then it has the same jurisdiction to reverse the determination that it has to set aside the verdict of a jury as against the weight of evidence."

If we find on examination that there was before the commissioner such a preponderance of evidence in favor of the relator as would call for our setting aside the verdict as against the weight of evidence had the testimony been presented to a jury, it is our duty to reverse the determination of the police commissioner. This requires a review of the evidence. The testimony offered against the relator in support of charges and specifications which had been served upon him tended to show that at about 12:20 o'clock on the afternoon of the 8th day of October, 1902, the relator was in Prospect Park, sitting on the side of

the slope near the lake, with two women, pointing a revolver at one of them; that a fellow officer (Peacock) hurried up to him, and demanded to know whether he had a permit for carrying firearms; that upon the refusal of the relator to give Peacock satisfactory answers they became engaged in a physical struggle; that the relator pointed the pistol at Peacock, and threatened to shoot him, and after some harsh language the relator showed his badge or shield, which he possessed as evidence of his official position, and Peacock released him, and permitted him to depart. The commissioner held, upon the evidence, that this conduct was unbecoming an officer, and sufficient to remove him from the force, and such an order was made.

The defense of the relator was an alibi, and the evidence of his witnesses tended to show that during the morning, and up to a time subsequent to this occurrence testified to by the witnesses for the prosecution, he was in the vicinity of his home at Canarsie, five miles distant from Prospect Park. Officer Peacock, with whom the relator was claimed to have had the trouble, testified that, although he had seen him before, he did not recognize him as Graham until one of the women who were with him addressed him by that name. I am satisfied from a careful reading of Peacock's evidence that his identification of Graham was not based upon that clear and distinct knowledge which the courts should require to be the character of evidence upon which it is sought to sustain proceedings of this nature, unless corroborated by satisfactory evidence of others. The credibility of Peacock is fairly attacked by the circumstance that he did not arrest the relator, although he asserts that he was at the time in the actual commission of a felony, when it was his plain duty to take him into custody. One Ross, a gardener in Prospect Park, was called to testify upon the subject of the identification of Graham. He came no nearer the scene of the fracas than 50 feet, had never seen Graham before, heard none of the conversation, and that the revolver used by Graham on this occasion was of a dark color. Peacock says it was blue. It appears that when Graham was arrested, a few moments after he reported for duty at the station house, in the evening of the same day, he had on his person only the regular revolver used on the force, which was nickel. Gerrity and Fullum gave a clearer identification than any other of the witnesses for the prosecution, but the character of these witnesses appears upon examination to be such that their evidence is not of the highest value. They were cronies, and one of them had been arrested by Graham before the transaction in question, and they both appeared to be "corner loungers." The witness Crump, who is assistant gardener of the park, attempted to identify Graham, and stated that he wore a mustache. It appears undisputed, except for the word of this witness, that the relator had worn no mustache for a long time prior to the month of October, 1902. Oberle, also employed in the park, got two glances at the relator. Once he saw him while his back was toward the witness, and the other time he got a side glance, and on these two views he attempts to identify him as the party in Prospect Park on the day in question. Mailand, a grocer, was in the Shelter House of the park, and testifies that he saw the relator there that morning under the influence of liquor, and, although he saw him but a mo-

ment, and never had seen him before, identifies him as the relator upon the trial. It is established that when the relator was arrested at the station house, six hours later, he showed no signs of having recently imbibed, or of having been under the influence of, liquor. Meehan, another gardener, also swears to the identity of the relator, and states that he was intoxicated. Grau, the barkeeper at the park, says also that he sold drinks to the relator on the day in question about 12 o'clock, and that he never saw him before nor since, until the day of the trial before the police commissioner.

This is a summary of the evidence produced against Graham on his trial, and is, I think, in the absence of so strong a defense as Graham was able to make, quite sufficient to support the action of the commissioner; but Graham's alibi was so clearly proved, and generally by such reputable witnesses, that we should reverse the judgment on the ground that it was against the weight of evidence. Graham was called in his own behalf, and testified in a clear and unambiguous manner as to his whereabouts during the whole of the day in question. He reached home from the police court between 11 and half past, and about 20 minutes of 12 walked out through Conklin, Rockaway, and G. avenues to Ninety-Second street, returning home about 1 o'clock, and then partaking of his dinner. To corroborate him as to the fact that he was in the vicinity of his home in Canarsie at the time when the offense with which he is charged was committed, the relator called 12 witnesses. Bebensee saw him on Avenue G between 12:30 and 12:45; Lott, a contractor, and Warner, a real estate agent, saw him feeding his chickens in his yard about 11:45; Blatz, an electrical engineer, and Chambers, a special policeman, Vitty, a switchman, another neighbor, and a hotel keeper in the vicinity, two painters who lived in the neighborhood, and a pattern maker who also lived in Canarsie, all testified without a show of contradiction or discredit that they saw the relator in various places in Canarsie, at least five miles distant from Prospect Park, at such times on the morning of the 8th day of October, 1902, that it would have been impossible for the relator to have been there at that time. The credibility or character of none of these witnesses was attacked. They were all neighbors and acquaintances of the relator, who had known him for some time, and who could not have been mistaken as to his identity.

From a careful reading of the evidence it seems clear to me that one who bore a strong resemblance to Graham must have been the offender in Prospect Park, and this unknown person was doubtless the one who bought the drinks, was intoxicated, wore the mustache, and possessed the revolver of a dark color. A wholesome use by the Appellate Division of the power it possesses to reverse upon the ground of the preponderance of the evidence has recently been urged by the Court of Appeals. Collier v. Collins, 172 N. Y. 99, 64 N. E. 787; Blumenthal v. Lewy, 82 App. Div. 535, 540, 81 N. Y. Supp. 528.

The point made by the relator that the determination of the police commissioner was without authority cannot be sustained. The record shows that the relator was tried before a deputy commissioner, and it also appears from the record itself that the same deputy commissioner found him guilty. The police commissioner merely approved this find-

ing, and upon examination of the record concurred with the finding of his deputy, and ordered the dismissal. We have recently approved the procedure which obtained in this case in People ex rel. Reardon v. Partridge, 86 App. Div. 310, 83 N. Y. Supp. 705.

The determination of the commissioner should therefore be reversed, with costs, and the relator reinstated.

WOODWARD, J., concurs for reversal.